Exhibit F

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| MICHAL ROSEBERRY, W.K., and J.T., | ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION |
| v. | ) ) | FILE NO. 1:25-cv-01062-LMM |
| STUDIO 6 DELK ROAD, LLC; LEXICON HOSPITALITY, LLC; LEXICON HOSPITALITY INVESTMENTS, LLC, | ) ) ) ) ) | |
| Defendants. | | |

## **FIRST AMENDED COMPLAINT**

COMES NOW Plaintiffs in the above-styled action and file their first amended complaint as follows:

1.

Plaintiffs are victims of sex trafficking at the Motel 6 located at 2360 Delk Road, Marietta, Georgia 30067 ("Motel 6"). W.K. and J.T. are victims of minor sex trafficking at the hotel. Michal Roseberry was trafficked at the motel in 2016. J.T. was trafficked at the motel as a minor, when she was 17 years old, in 2012. J.T. was again trafficked at the motel from 2015–2016. W.K. was trafficked at the hotel as a minor in 2013 and 2014, when she was 15 and 16 years old. Given the nature of the case, Plaintiffs J.T. and W.K. are identified in this complaint by their initials to

1

prevent public disclosure of their names. Plaintiffs' counsel will disclose the full names to defense counsel as soon as they are known or as soon as an appropriate protective order is in place.

## 2.

Defendant Studio 6 Delk Road, LLC is a Georgia company authorized to transact business in Georgia and is subject to the jurisdiction and venue of this Court. Service can be made on said Defendant by serving its Registered Agent: Richard Evins, 1198 Buckhead Crossing, Suite B, Woodstock, Georgia 30189.

## 3.

Defendant Studio 6 Delk Road, LLC has been properly served with process in this action.

## 4.

Jurisdiction and venue are proper as to Defendant Studio 6 Delk Road, LLC.

## 5.

Defendant Lexicon Hospitality, LLC is a Georgia company authorized to transact business in Georgia and is subject to the jurisdiction and venue of this Court. Service can be made on said Defendant by serving its Registered Agent: Richard Evins, 406 Ridley Avenue, Lagrange, Georgia 30240.

## 6.

Defendant Lexicon Hospitality, LLC has been properly served with process

Exhibit F 002

in this action.

7.

Jurisdiction and venue are proper as to Defendant Lexicon Hospitality, LLC.

8.

Defendant Lexicon Hospitality Investments, LLC is a Georgia company authorized to transact business in Georgia and is subject to the jurisdiction and venue of this Court. Service can be made on said Defendant by serving its Registered Agent: Richard Evins, 406 Ridley Avenue, Lagrange, Georgia 30240.

9.

Defendant Lexicon Hospitality Investments, LLC has been properly served with process in this action.

10.

Jurisdiction and venue are proper as to Defendant Lexicon Hospitality Investments, LLC.

11.

At all times herein, Defendants jointly owned, operated, maintained, controlled, managed, and/or were responsible for securing the Motel 6, from which they benefited financially.

Exhibit F 003

12.

At all times relevant hereto, Defendants owned, operated, maintained, controlled, and managed the Motel 6 as a joint venture, sharing valuable information, data, responsibilities, and financial benefits from the motel's operation, and each having rights of mutual control over the motel and each other.

13.

Any distinctions between Defendants are on paper only. In reality, the three Defendants shared employees, finances, and responsibilities for the operation of the Motel 6. Defendant Studio 6 is ostensibly the landowner, but is wholly controlled by its sole member, Defendant Lexicon Hospitality Investments, which conducts all the business of Defendant Studio 6, including the eventual sale of the property. Defendant Lexicon Hospitality has long advertised its own involvement in operating the Motel 6.[1]

14.

Defendants shared assets, money, employees, office locations, board members, entered into contracts with each other without consideration, had employees of one company conduct the business of other companies, and generally ignored the corporate forms that are the hallmark of separate entities.

---

[1] *See* Ex. 1, lexicon-hospitality (Oct. 29, 2019), lexicon-hospitality.com; *see also* http://lexicon-hospitality.com/, Wayback Machine (Jan. 1, 2025, 8:14 AM), https://web.archive.org/web/20200127185504/http://lexicon-hospitality.com/.

**Exhibit F 004**

15.

For the purposes of owning, operating, and managing the Motel 6, during the relevant time, Defendants functioned as a single entity and exercised control jointly over the motel and over each other.

16.

Defendants knew of the rampant sex trafficking and prostitution at the motel for years, before, during, and after Plaintiffs' trafficking. Defendants knew because:

a) the facts of these specific Plaintiffs while they were trafficked for sex at the motel;

b) their employees knew of and permitted sex trafficking and prostitution to occur at the motel;

c) the facts of multiple other sex trafficking victims at the motel before, during, and after Plaintiffs' trafficking;

d) the frequent and ongoing similar crime occurring at the motel;

e) the reports of motel guests to Defendants regarding sex trafficking and prostitution-related activities; and

f) Defendants' knowledge of sex trafficking generally, in the Atlanta area, and at this location specifically.

5

17.

A person under the age of 18 cannot consent to having sex in exchange for money. Any commercial sex involving a person under eighteen (i.e. "minor sex trafficking") is *criminal* sex trafficking under federal and Georgia law whether the minor had a trafficker/pimp and does not require evidence that the victim was subject to "force, fraud, or coercion." 18 U.S.C. § 1591(a); O.C.G.A. § 16-5-46(8)(B). Every person who engages in commercial sex with a minor is trafficking that minor under 18 U.S.C. § 1591(a)(1).

18.

Sex trafficking and prostitution were common occurrences at the Motel 6 and Defendants chose to ignore, allow, condone, facilitate, support, and/or permit such activity at the motel. Defendants are liable to Plaintiffs for their actions and failures to act. Defendants' liability to Plaintiffs is straightforward:

a) The Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a), provides a cause of action to victims of sex trafficking against "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of" the TVPRA. Defendants knowingly benefited from participation in a venture which they knew or should have known engaged in an act in violation of the TVPRA because

6

**Exhibit F 006**

in the operation of the motel, they (i) rented the rooms at the Motel 6 to Plaintiffs' traffickers so that Plaintiffs could be violently sold for sex at the motel; (ii) collected fees for rental of those rooms, and (iii) did so notwithstanding that they knew or should have known that Plaintiffs were victims of sex trafficking at the motel. As such, Defendants are liable to Plaintiffs for their damages under the TVPRA.

b) The Motel 6 constituted both public and private nuisances under Georgia law because the motel negligently or recklessly turned a blind eye and permitted illegal activities to occur at the motel, including rampant prostitution, crimes against women, dangerous illegal activity, drugs, violence, harboring missing and runaway underage girls, harboring wanted felons, sex crimes, and sex trafficking. As a direct result of this nuisance, Plaintiffs were sold for sex at the Motel 6, causing them substantial harm.

c) Because J.T. and W.K. were minors when they were trafficked at the Motel 6, and because Defendants knowingly facilitated their trafficking, Masha's Law, 18 U.S.C. § 2255, provides a civil remedy to J.T. and W.K. for the substantive violation of 18 U.S.C. § 1591.

19.

Whenever reference is made in this complaint to any act, deed, or conduct of Defendants, the allegation is that Defendants engaged in the act, deed, or conduct by

**Exhibit F 007**

or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Defendants and the Motel 6.

## I.    Michal's Trafficking at the Motel 6

20.

Michal was trafficked at the Motel 6 from roughly the end of 2015 through March 2016. She was trafficked at the Motel 6 at the same time as J.T. The conditions and circumstances at the Motel 6 during J.T.'s trafficking (and described below) were identical to those experienced by Michal during her trafficking.

21.

Michal was trafficked with other girls at the Motel 6 by a violent trafficker. At times, she shared a room with two other victims, and at times, her trafficker exploited as many as 8 victims at the Motel 6 at once. The girls showed visible signs of abuse, including bruises, split lips, and chunks of hair torn from their scalps. And they often appeared around the hotel in skimpy clothes to attract buyers.

22.

Michal and the other girls were noticeably subservient to the trafficker at the motel. The trafficker frequently made a scene to emphasize his control over the girls at the motel. Michal and the other victims were not permitted to speak in public. When a person came up to them at the motel, the trafficker would come over and

**Exhibit F 008**

ask what the person wanted. The girls also were not allowed access to phones and had to walk around the motel with their heads down to avoid eye contact with others.

23.

Defendants knew or should have known that Michal was being trafficked based on these signs and behavior.

24.

Michal was sold for sex to roughly 15 men per day while she was at the Motel 6. So were the other two victims in her room. Thus, roughly 45 men visited the single room shared by the victims each day to purchase sex throughout the several months Michal was trafficked at the Motel 6. Defendants knew or should have known that the huge number of men visiting the room each day was indicative of Michal's sex trafficking at the motel. In addition to the dozens of men coming to the rooms to buy sex, the trafficker also sold drugs at the motel, which led to even more foot traffic to the rooms.

25.

Employees at the Motel 6 assisted and facilitated Michal's trafficking by helping to conceal the trafficking and by acting as lookouts for her trafficker. Employees frequently disposed and destroyed a substantial amount of evidence of sex trafficking for Michal's, and other, traffickers.

9

26.

Employees at the Motel 6 knew Michal's trafficker and it was apparent he had done business with Defendants before. Upon arrival at the Motel 6, the trafficker would fist bump and hug the front desk employee and speak in a way that clearly indicated the two were friendly and had a history together.

27.

Once, Michal was seen by this same front desk employee in the lobby alongside her trafficker and three or four of his other victims. A comment was made that provoked the trafficker, who then struck Michal in the face with enough force to draw blood, all in plain view of the front desk employee. The employee locked eyes with Michal before casually telling the trafficker, "Not in the lobby." Rather than intervening or contacting law enforcement, the employee allowed—indeed, encouraged—the trafficker to take his victims back to the room, where he continued to violently assault and sell them for sex to dozens of men each day. In doing so, Defendants' employee helped to conceal the trafficking venture by letting Michal's trafficker know in which areas of the hotel it was safe to beat his victims bloody and maintain them in servitude, without attracting the attention of the police or other law-abiding guests.

**Exhibit F 010**

28.

Once, Michal tried to escape her trafficker at the Motel 6 by bolting out of the room in her underwear. The trafficker chased her down in the parking lot and dragged her back to the room, where she was beaten again.

29.

Michal was aware of at least a dozen other girls being sold for sex at the motel while she was there, but also recognized more who she did not interact with. Many of these girls were young and looked to be under the age of 18. She also was aware of at least 5–10 other traffickers at the motel, as well as others she did not interact with.

30.

Housekeeping came to the room and, due to the large number of men buying the victims for sex, found trash cans that were full of more than 40 condoms each day, boxes of condoms and bottles of lubricant, multiple girls in underwear or skimpy clothes, and drug needles and other paraphernalia. Defendants knew or should have known that these signs, among others, were signs of Michal's trafficking at the Motel 6.

31.

On a regular and ongoing basis, Defendants' employees knowingly took the evidence of trafficking from the trafficker's room, disposed of and destroyed that

11

evidence, so that any investigation into the trafficker would be stymied by the destruction of such evidence.

32.

Defendants had a policy to allow and facilitate sex trafficking at the Motel 6, including the sex trafficking of Michal. Defendants enacted that policy by, among other things, agreeing to house Michal's trafficker and his trafficking venture, his associates, and up to 8 victims at a time. Defendants knowingly and actively disposed of and destroyed physical evidence of Michal's sex trafficking for her trafficker, protecting him from potential investigation by the police. Defendants even specifically instructed Michal's sex trafficker on which areas of the motel were safe for him to beat his victims bloody, and which areas of the motel Michal's trafficker should avoid beating his victims bloody, so as to evade detection by the police or other non-criminal guests, to the extent such guests existed.

## II.    Plaintiff J.T.'s Trafficking at the Motel 6

33.

J.T. was trafficked repeatedly at the Motel 6 during two time periods, in 2012, when she was 17 years old, and again from 2015–2016.

34.

In 2012, when she was 17, J.T. was trafficked for two straight months at the Motel 6 by a trafficker who regularly stayed at the motel.

12

35.

Later, from 2015–2016, J.T. was trafficked at the Motel 6 again by a different trafficker.

36.

J.T.'s behavior was noticeably subservient to her trafficker around the motel. She was made to keep her head down and not look men in the eyes. Once, she was beaten by her trafficker at the Motel 6 for looking another man in the eyes. Defendants knew or should have known of these signs of the minor and adult sex trafficking victim. J.T. was frequently beaten by her trafficker in and around the Motel 6.

37.

At all times when J.T. was trafficked at the Motel 6, it appeared to her that the majority of the people staying on the property were either girls being sold for sex or those involved in the illegal drug trade. Girls being sold for sex stood outside their rooms wearing very skimpy clothing and walked the parking lot to solicit men to come into the motel to purchase sex. Very often, these girls would be bought for sex that would occur in the parking lot of the motel.

38.

The girls being sold for sex at the motel all wore skimpy clothes, openly advertising their availability for purchase. On average, there were usually at least 25

13

Exhibit F 013

different girls at the Motel 6 or in the parking lot being sold for sex. Some girls would solicit men for sex in the parking lot and then have sex in the parking lot to get money to then pay for a room to rent at the motel.

39.

J.T. witnessed several dozen incidents of traffickers violently beating girls openly in and around the Motel 6. She witnessed dozens of different men trafficking or attempting to traffic the girls being sold for sex at the Motel 6.

40.

Employees at the Motel 6 assisted and facilitated the sex trafficking that was rampant at the Motel 6, including J.T.'s. Housekeepers delivered the extra towels that J.T. and other victims needed to clean themselves between sex buyers. The employees allowed the trafficking in rooms to continue in exchange for extra tips. J.T.'s trafficker (and at times J.T., at her trafficker's direction), along with other victims and traffickers, regularly paid the housekeepers for their assistance and for enabling the trafficking and not reporting it to authorities.

41.

Front desk employees also allowed the trafficking at the motel, and J.T.'s trafficker paid those employees for their assistance. Some front desk staff exchanged rooms at the motel for sex with other sex trafficking victims there.

14

42.

On June 25, 2016, as a result of the motel's facilitating her sex trafficking, and in addition to the constant sex trafficking, J.T. was raped at the Motel 6.

43.

The widespread commercial sex activity at the Motel 6 attracted a significant number of buyers to the property each day. J.T. estimates that the Motel 6 accommodated more than 100 buyers each day. Defendants knew or should have known that the number of daily, older male visitors to the motel was clearly indicative of sex trafficking and child sex trafficking.

44.

While J.T. was trafficked at the Motel 6, she was made to have sex with roughly 5 men each day. Defendants knew or should have known that the number of daily, older male visitors to the room was clearly indicative of sex trafficking and child sex trafficking.

45.

Housekeeping came to the room J.T. was trafficked in and found trash cans full of condoms, boxes of condoms and bottles of lubricant, multiple girls in underwear or skimpy clothes, and drug needles and other paraphernalia. Defendants knew or should have known that these signs, among others, were signs of Michal's trafficking at the Motel 6.

15

46.

On a regular and ongoing basis, Defendants' employees knowingly took evidence of trafficking from the trafficker's room, disposed of and destroyed that evidence, so that any investigation of J.T.'s trafficker would be stymied by the destruction of such evidence.

47.

Defendants had a policy to allow and facilitate sex trafficking at the Motel 6, including the sex trafficking of J.T. Defendants enacted that policy by, among other things, agreeing to house J.T.'s traffickers and their trafficking ventures, his associates and victims. Defendants took tips in exchange for lookout services for J.T.'s trafficker. Defendants knowingly and actively disposed of and destroyed physical evidence of J.T.'s sex trafficking for her traffickers, protecting them from potential investigation by the police.

## III.    Plaintiff W.K.'s Trafficking at the Motel 6

48.

W.K. was trafficked at the Motel 6 off and on from roughly the summer of 2013 to the end of 2014, when she was 15 and 16 years old. The conditions and circumstances at the Motel 6 during W.K.'s trafficking were the same as those experienced by Michal and J.T., described above.

16

49.

Employees at the Motel 6 assisted and facilitated W.K.'s trafficking. Hotel housekeepers came into the rooms where W.K. was trafficked and removed trash cans filled with used condoms, saw the teen in skimpy clothing, and observed the cocaine that W.K.'s trafficker left out on tables in the room.

50.

On a regular and ongoing basis, Defendants' employees knowingly took evidence of trafficking from W.K.'s trafficker's room, disposed of and destroyed that evidence, so that any investigation of W.K.'s trafficker would be stymied by the destruction of such evidence.

51.

The housekeepers acted as lookouts for the trafficker and permitted W.K.'s trafficking to continue.

52.

Hotel employees also knowingly provided rooms to W.K.'s trafficker on credit, allowing payment at a later time. When W.K.'s trafficker did not have the money for the day's room, the hotel allowed the trafficker to stay in their room without paying for it, loaning the room to W.K.'s trafficker to sell the minor W.K. in first, and then using the proceeds to cover the cost of the room afterward. In short, the hotel loaned its rooms out to traffickers, including specifically W.K.'s trafficker,

**Exhibit F 017**

so the hotel could be paid after some illegal money was raised through trafficking W.K. in the hotel. Defendants knew or should have known of their policy to loan its rooms to traffickers, including W.K.'s, in order to generate revenue from traffickers who found themselves short of funds.

53.

When W.K. was trafficked at the Motel 6, she saw many other girls and women who were obviously being sold for sex at the hotel. She was aware of several other traffickers in charge of those girls at the hotel. These women and children wore lingerie and skimpy clothing throughout the hotel and parking lot and there was a constant stream of traffic throughout the day of men with no luggage visiting the hotel rooms of these women and children for short periods of time before leaving and being followed by other anonymous men.

54.

W.K. and other sex trafficking victims frequently appeared throughout the hotel and on the hotel premises and approaches wearing very little clothing. Often, these women and children could be seen loitering around the hotel soliciting buyers of sex at the hotel. Defendants knew or should have known that these were signs of sex trafficking at their hotel.

18

55.

While W.K. was trafficked for sex at the Motel 6, she exhibited numerous well-known and visible signs of a child sex trafficking victim, of which Defendants knew or should have known, including her young age and inappropriate appearance, fatigue, sleep deprivation, injuries, a failure to make eye contact with others, loitering, soliciting male patrons, and monitoring and control of W.K. by her trafficker. Defendants knew or should have known that W.K. was being trafficked based on these signs and behavior.

56.

W.K. was sold for sex to more than 10 men per day while she was at the Motel 6. Defendants knew or should have known that the huge number of men visiting the room each day was indicative of W.K.'s sex trafficking at the motel.

57.

Defendants had a policy to allow and facilitate sex trafficking at the Motel 6, including the sex trafficking of W.K. Defendants enacted that policy by, among other things, agreeing to house W.K.'s trafficker and his trafficking venture, his associates and victims. Defendants even loaned its motel rooms to W.K.'s trafficker for free, knowing that he would be able to raise the money to pay the rent later after he had sold the minor W.K. for sex. Defendants knowingly and actively disposed of

19

and destroyed physical evidence of W.K.'s sex trafficking for her traffickers, protecting them from potential investigation by the police.

## III.   Defendants' involvement with other trafficking victims at the Motel 6.

58.

Defendants had a policy to not call the police regarding known sex trafficking at the motel. Defendants enacted this policy in the cases of Michal, J.T., and W.K., as well as other sex trafficking victims.

59.

One victim, N.W., whose declaration is attached to this complaint[2], was a resident of the Motel 6 for about 6 months in 2012. She was 20 years old and was held by a trafficker against her will. N.W. was sold for sex to more than 10 men per day.

60.

N.W. observed that nearly every young female at Defendants' motel were also being sold for sex. She saw men coming and going every hour and noticed the pimps who sat in cars outside to watch the rooms and make sure the girls inside did not escape and continued to see the men coming in and out.

---

[2] *See* Ex. 2, N.W. Declaration.

**Exhibit F 020**

61.

On October 29, 2012, a man came into N.W.'s room and demanded sex from her. She did not know him and told him to leave. The man called the police and told them that he was being robbed. The man left before he arrived. Defendants response was only to move N.W. to a different room.

62.

A.M., whose declaration is attached to this complaint[3], was also trafficked at Defendants' motel for several years. She was sold for sex to 7 or 8 men per day.

63.

A.M. was instructed by her trafficker to "get cool" with the housekeepers and hotel staff. So, A.M. tipped the housekeepers so that they would conceal and protect the trafficker, as well as destroy the evidence of trafficking in the room.

64.

Defendants' maintenance worker regularly came to A.M.'s room and told A.M. that her trafficker sent him to the room to get what he wanted, which was sex. A.M. had to have sex with the maintenance worker numerous times while she was trafficked at Defendants' motel.

---

[3] *See* Ex. 3, A.M. Declaration.

65.

A.M.'s trafficker was very close to one housekeeper in particular and seemed to have a history with that housekeeper.

66.

A.M. knew of two other girls who were being trafficked at the same time at the Motel 6. One girl was 16 years old and the other was 15 years old. Those two girls were trafficked by another trafficker.

67.

A.M. always saw lots of girls, young and old, dressed like prostitutes walking the property and soliciting men in cars. She, like N.K., also saw the traffickers in the parking lot waiting while the girls were being sold for sex in the rooms.

68.

It was obvious to A.M. that Defendants' motel was filled with illegal sex workers and minors being sold for sex.

## IV.     Defendants' Knowledge of Prior Crime at the Motel 6

69.

The Motel 6 was well known for crime, prostitution, and sex trafficking. Defendants had actual and constructive knowledge of criminal activity existing on the property and in the surrounding area prior to Plaintiffs' trafficking.

Exhibit F 022

70.

Defendants directly operated the Motel 6 and employed the employees at the Motel 6, giving them specific and direct knowledge of prior and ongoing crime, including prostitution and sex trafficking occurring at the motel during that time period.

71.

Prior to Plaintiffs' sex trafficking at Motel 6, prostitution, sex trafficking, and child sex trafficking were rampant and frequent occurrences at the motel, obvious to employees and guests.

72.

Defendants provided a market and beds for sex traffickers to sell women, boys, and girls—including children—to buyers of commercial sex.  That is why Plaintiffs' sex traffickers brought Plaintiffs to the Motel 6 to be sold for sex for months.

73.

Defendants maintained a policy or practice of refraining from contacting law enforcement, even when presented with clear indications of criminal activity, including sex trafficking, on its premises. This policy was furthered and reinforced by the actions of Defendants' employees, who, instead of reporting suspicious activities to authorities, took money from traffickers to permit sex trafficking at the

23

Motel 6. This practice created a safe environment for traffickers, including Plaintiffs' traffickers, to exploit their victims.

74.

Prior to Plaintiffs' sex trafficking at the Motel 6, patrons frequently saw women who were being sold for sex at the motel loitering outside, soliciting men for sex, and observed the heavy foot traffic surrounding the rooms where sex and drugs were being sold at the motel.

75.

Defendants knew or should have known of sex trafficking, prostitution, and other criminal activity existing at the Motel 6 prior to Plaintiffs' sex trafficking there.

76.

In addition to all of the above, the police frequently investigated and made arrests for substantially similar instances of criminal activity at the Motel 6. Much of this activity either alerted or should have alerted Defendants to the motel's rampant sex trafficking, prostitution, and sex crime problem. As mere examples, among many other instances, the police responded to the following incidents at the motel before, during, and after Plaintiffs' trafficking:

    i.    On July 13, 2011, a man stole a woman's phone at the Motel 6. It was determined that the woman was engaging in **prostitution** at the motel to support her young child, also living at the hotel.

24

ii.    On July 23, 2011, a woman was **raped** at the Motel 6.

iii.    On December 18, 2011, a missing runaway juvenile was found in a room at the Motel 6 with three men armed with guns.

iv.    On January 1, 2012, a man threw a woman's belongings into the hotel parking lot and told police she was a **prostitute** he was "finished" with.

v.    On February 1, 2012, the FBI MATCH task force conducted an undercover operation and arrested a female for **prostitution**.

vi.    On February 10, 2012, a man became belligerent with an alleged **prostitute** and broke a TV in the room.

vii.    On July 3, 2012, a **missing juvenile** reported to police that her mother was attempting to **sell her for sex** at the Motel 6.

viii.    On August 14, 2012, an adult woman was kidnapped at the Motel 6 by two men and a woman who then **trafficked her for sex** around the state.

ix.    On August 16, 2012, the FBI MATCH task force conducted an undercover operation and arrested **three women for prostitution** and a man for pimping at the Motel 6.

x.    On December 9, 2012, a woman was **sexually assaulted** at the Motel 6.

**Exhibit F 025**

xi.  On January 6, 2013, a woman was arrested for **prostitution** and provided a hotel security guard who was an off-duty police officer with "information on other illegal activity at the hotel."

xii.  Between May 30 and June 1, 2013, a woman was **trafficked for sex** at the Motel 6 and was forced to "hang out in the parking lot looking for sex partners." Her trafficker was ultimately arrested after punching the victim so hard that she lost her hearing in one ear and her hand was swollen so bad she could no longer move her fingers.[4]

xiii.  On June 1, 2013, a 14-year-old was **statutorily raped** by two adult men at the Motel 6.

xiv.  On July 27, 2013, the FBI MATCH task force conducted an undercover operation at the Motel 6, resulting in the arrest of two adults for **pimping** and one adult for prostitution.

xv.  The next day, on July 28, 2013, the FBI MATCH task force conducted an undercover operation and arrested a woman for **prostitution**.

---

[4] Rodney Thrash, *Warrant: Alleged Pimp Causes Woman to Lose Hearing*, Patch (Jan. 21, 2025, 9:43 AM), https://patch.com/georgia/marietta/warrant-alleged-pimp-causes-woman-to-lose-hearing.

**Exhibit F 026**

xvi.   On October 26, 2013, a woman called the police, admitted she was a **prostitute**, and informed them that her **pimp** was at the Motel 6 with a "client."

xvii.   On March 26, 2014, a man was robbed at the Motel 6 by two men after attempting to **solicit a prostitute** at the motel.

xviii.   On July 6, 2014, a **missing juvenile** was reported at the Motel 6.

xix.   On August 30, 2014, an undercover police officer in the Motel 6 parking lot was **solicited by a prostitute** who walked up to his car.

xx.   On December 18, 2014, a woman was arrested for **prostitution** during an undercover sting at the Motel 6.

xxi.   On the same day, another woman was arrested for **prostitution** at the Motel 6.

xxii.   On March 23, 2015, a man was arrested at the Motel 6 after being found with drugs and a **naked 16-year-old girl** in the room.

xxiii.   On June 19, 2015, four different women were arrested at the Motel 6 during a **prostitution sting**.

xxiv.   On October 4, 2015, a juvenile reported being **raped** at the Motel 6.

xxv.   On March 19, 2016, a woman reported being **sexually assaulted** at the Motel 6.

27

xxvi.    On July 24, 2016, police investigated a **sexual battery** involving a minor.

xxvii.   On July 31, 2016, a man was arrested for **sexually abusing a minor** at the Motel 6.

xxviii.  On June 9, 2017, a woman was **sexually assaulted** after noticing three men in a room using cocaine.

xxix.    On July 16, 2017, a woman reported that a man was **pimping** out a female at the Motel 6. The female victim told police that she needed the man's permission to speak with them. The room they were in was found to be full of heroin paraphernalia.

xxx.     On August 22, 2017, a woman reported a **sexual assault** at the Motel 6.

xxxi.    On October 1, 2017, a woman reported she was **raped** at the Motel 6.

77.

These are just documented *sex crimes* at the Motel 6. Of course, there are hundreds of other crimes during this period, from drugs to violence to robberies. These types of prior reported police activity, along with many other examples, all caused or should have caused Defendants to recognize that the motel was frequently being used for the purposes of sex trafficking.

28

**Exhibit F 028**

78.

Defendants had actual or constructive knowledge of publicly available online reviews of the Motel 6 reporting prostitution and crime occurring at the motel, including the following:

(i)     June 14, 2012, from foursquare.com:

"Always request the least ghetto part or you will be sure to have early wake up calls from police kicking in some random drug dealers door"

(ii)    September 7, 2013, from expedia.com:

**Dangerous and Horrible**

"This property is completely miss-represented by their online website which contains mostly pictures of a different property across the street. Entire property is not well maintained. Many unsavory people appearing to just hang out and **clear indications of illegal behavior occurring**. . .The only time in my life that I felt I had to flee for my own safety. Property is probably a public safety danger."

(iii)   January 19, 2015, from yelp.com:

"My second night Random people on separate occasions just knocked on my door . . . I did not open the door I just acknowledged them through the door and asked that they needed, at which time I was **asked if I would sell them a 20 of crack** this happened three times in two separate rooms . . ."

(iv)    May 28, 2015, from tripadvisor.com:

"The people staying there looked like **drug dealers and prostitutes** I didn't feel safe AT ALL."

29

(v)    <u>June 11, 2015, from tripadvisor.com:</u>

". . . **the locals know this motel 6 as a place where prostitutes go**. I had to find that out the hard way as I had prostitutes and randoms walking outside my room at 3 in the morning, and yelling and screaming coming from other rooms that didn't sound like normal sex sounds."

(vi)    <u>June 22, 2015, from tripadvisor.com:</u>

"**Prostitutes,crack heads,pimps,and gang bangers** EVERYWHERE!!! AVOID THIS DUMP LIKE THE PLAGUE!! . . . VERY BAD PLACE!!! DO NOT take your family here!!!"

(vii)    <u>April 2016, from tripadvisor.com:</u>

**"Not a place for your family"**

". . . On top of all this, partying to where the cops had to sit in the parking lot all night, **Johns and Prostitutes going in and out**, oh ya, a conveience store told me they use a site to mere there 'Johns' there…"

(viii)    <u>June 2016, from tripadvisor:</u>

**Not a hotel it's a drugland**

"My time spent here was mainly me cooped up in my room. Every time I went out a **drug dealer approached me or a pimp**."

(ix)    <u>September 2016, from booking.com:</u>

**Horrible Motel**

"This motel is horrible. [. . .] Shady characters were hanging around. Was in the area for business, but will never stay here again.  Filthy!"

(x)    <u>September 2016, from tripadvisor.com</u>

**Don't stay here.**

**Exhibit F 030**

"Witnessed drug deals outside of our room."

(xi)   <u>October 2016, from tripadvisor.com:</u>

"Walking into the lobby I thought it was nice but once I got to the room the first thing I saw was the cops circling the building and a couple of people just standing outside this was now about 1:30am I get to my room after my friend left me and the first thing I hear is an argument that went on half the night then a **pimp telling his working she need to make her money no matter how cold it was**. [. . .] Next day it was a drug deal next to my room."

(xii)   <u>September 4, 2017, from yelp.com:</u>

"stay the hell away from here !!! please stay away it is a scam you book online and when you get here they say only jacuzzi room available for more money its nasty as hell people live here little boy followed me asking for money with no shoe strings no towels the Indian woman at the front desk is disgusting and hangs out with the people that live here this damn place shouldnt even be open to the public it's not even 1 star"

(xiii)   <u>October 2017, from tripadvisor.com:</u>

"Filthy and scary. People drinking alcohol and doing drugs on the property. I was seriously scared for my safety."

(xiv)   <u>From 2018, from Google reviews:</u>

"There was a room on the ground floor that had questionable activity. A man yelling and cursing at a lady inside the first day. Many different people in and out . . ."

(xv)   <u>From 2018, from Google reviews:</u>

"Also this is a **very bad drug and prostitution Hotel** . . ."

(xvi)   <u>May 27, 2018, from yelp.com:</u>

"Drug dealers run undeterred and **hookers wonder the balcony** at all times of day(not exaggerating)."

**Exhibit F 031**

(xvii)  August 23, 2018, from yelp.com:

"This motel gets 2 ratings. I would give it a 1 or a 5 depending on what you are looking for. Let's start with the good. **If you are a pimp/drug dealer looking for a place to run your business out of or a broke stoner this place is the place for you.** It's cheap and if you are there to turn tricks you wont even notice the bugs. If you are a broke stoner all you have to do is walk around outside and you will probably get a buzz. If this is you then this place gets a 5 star rating. . . . **There was a guy literally running his prostitution business out of the hotel.**"

(xviii) October 25, 2018, from booking.com:

**If I hadn't been so exhausted I would've left.**

"This was the worst motel I've ever stayed in . . . There was a wild sex party going on in the room next-door all night. Apparently it's that kind of motel . . ."

(xix)  June 2019, from tripadvisor.com:

**Super filthy run down and unsafe**

"**Drugs, prostitution** . . . Place can be unsafe as people from all walks of life live there and drugs are being run from the hotel. Place frequently gets trashed lost of noises and screams at night. Stay away…"

(xx)  From 2019, from Google Reviews:

"We picked our son up and . . . didn't get back to the room until almost 11:30. The parking lot was full and the balconies was full of people hanging out smoking. Were in the room next to a drug dealer who had people walking past our door all night and talking loud."

(xxi)  From 2019, from Google Reviews:

"ABSOLUTELY HANDS DOWN the WORST hotel ever. As soon as we pulled in thugs EVERYWHERE, people screaming, doors slamming, people dealing drugs out in the open."

32

(xxii)  From 2019, from Google reviews:

"Definitely a terrible place to stay. I paid for a week stay in advance and they put me and my family in a room on the 3rd floor with a 2.yr old and threatening to kick us out over footsteps…so I go to get a refund and they switched they're rates from the weekly rate I was charged to the day to day rate to take more money than they were supposed to. Meanwhile the drug activity and criminal activities are real. I had a random guy I never met knock on my door and wake my kids asking to buy           drugs.        very        TERRIBLE           STAY!"

(xxiii)  From 2019, from Google reviews:

"When I came back from my event there were about 4 guys on every floor sending each other signals so they can rob people! Then the police was marching around the property all night! Not only that there were visible crackheads with the door open shooting up as if it was a ok."

(xxiv) From 2019, from Google reviews:

"Also, **the amount of prostitution was astounding** for a hotel just off the freeway, in a high traffic area."

(xxv)  From 2019, from Google reviews:

"BED BUGS, ROACHES, PROSTITUTION, DRUGS. The last two are what keeps this place open. You can smell marijuana on every part of the walk to your room, which is honestly the least of the worries here. . . . Lots of people standing around alone or in groups outside after midnight."

(xxvi) From 2020, from Google reviews:

". . . This was the worst motel I ever stayed at. . . . Pure nasty owners. **The owners promote prostitution**. The people that live there hang out in the front of the establishment all evening and night which is bad for business…"

**Exhibit F 033**

(xxvii) <u>From 2022, from Google reviews:</u>

"If for any reason they determine your stay must end then they will throw you and your belongings into the street immediately. We were told that someone from our room called 911. However, 911 was never called. They said we had to leave immediately. . ."

(xxviii) <u>May 29, 2022, from yelp.com:</u>

"Avoid this place unless you absolutely can't find anything. Most of the "guest" are residents living here . . . The guest were fighting/arguing followed by what sounded like gunshots. And we were only here for two nights…"

(xxix) <u>May 27, 2023, yelp.com:</u>

"While waiting and on the way to the room, I saw **drug and prostitutes**."

(xxx) <u>June 1, 2023, from priceline.com:</u>

"Very loud at night..several uninvited knocks on the door through out the night. **Possible prostitution** could've been in play on a nightly basis."

(xxxi) <u>July 4, 2023, from priceline.com:</u>

". . . very bad experience I called at the property an no one has reached out to me about refunding me nor any accommodations for the terrible experience with a special needs child while ppl outside of the location fighting an holding firearms out."

(xxxii) <u>May 2024, from Google reviews:</u>

"The problem was I was staying below a drug dealer I believe, a lot of traffic all day and night constantly, the whole motel was like that, and yes there was roaches in room. Wasn't happy with stay."

(xxxiii) <u>April 2024, from Google reviews:</u>

 "At midnight, we heard sounds of people fighting and screaming."

(xxxiv) <u>April 2024, from Google reviews:</u>

"Random people knocked on my door at 2 am. The last night we stayed there was a **lady walking around outside naked as a jay bird**."

79.

Defendants knew or should have known that these and other customer reports showing the dangerous nuisance of the property and the rampant crime that occurred on the premises.

## V.     Defendants' Knowledge of Sex Trafficking Generally

80.

Defendants knew or should have known of the existence of sex trafficking and its illegality more than 20 years ago, since the passage of the Trafficking Victims Protection Act in 2000 and the United Nations' adoption of the Palermo Protocol to prevent, suppress, and punish trafficking in persons.

81.

Defendants knew or should have known that during the relevant period Atlanta was a national hub of sex trafficking and that crime was prevalent in the city, including at the Motel 6. According to a well-publicized study commissioned by the U.S. Department of Justice, Atlanta had one of the largest illegal sex trafficking

economies in the country. In 2007, Atlanta's sex trafficking economy was worth $290 million annually, and traffickers reported average *weekly* earnings of roughly $33,000.[5] Over the last two decades, sex trafficking has generated billions of dollars in illicit profits in metro Atlanta alone. Defendants have received and retained some of those illicit profits through renting motel rooms used for the trafficking of Plaintiff.

82.

Defendants knew or should have known of the Atlanta area's well-publicized reputation as an "epicenter for human trafficking, [] particularly child sex trafficking,"[6] and as "the number one city for child sex trafficking."[7]

83.

Defendants knew or should have known that motels and hotels are "a particularly attractive site for criminal activity ranging from drug dealing and

---

[5] See Christian Boone, *Study: Atlanta's Sex Trade Highly Profitable*, Atlanta Journal-Constitution, Mar. 13, 2014, https://www.ajc.com/news/crime--law/study-atlanta-sex-trade-highly-profitable/GiuU5vZdoUo5vdUYSaOBNM (last visited Jan. 21, 2025); *see also* Meredith Dank et al., *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities* 30–32 (2014), https://www.urban.org/research/publication/estimating-size-and-structure-underground-commercial-sex-economy-eight-major-us-cities (last visited Jan. 21, 2025).

[6] Sally Yates, Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month (Jan. 29, 2015), https://www.justice.gov/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department (last visited Jan. 21, 2025).

[7] *Id.*

36

prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers." *City of Los Angeles v. Patel*, 576 U.S. 409, 428–29 (2015) (Scalia, J., dissenting, joined by Roberts, C.J. and Thomas, J.).

84.

Defendants knew or should have known the following: The National Human Trafficking Hotline has reported that over 91 percent of the calls it received involving motels and hotels reported sex trafficking, and another 2.6 percent reported a combination of sex and labor trafficking.[8] A 2012 study found that 63 percent of trafficking incidents occurred in motels.[9] And the Polaris Project found that "75 percent of [trafficking] survivors . . . reported coming into contact with motels at some point" during their exploitation.[10] Unfortunately, "94 percent" also

---

[8] National Human Trafficking Hotline, *National Hotline Cases Occurring in Motels and Motels: United States 1/1/2012–12/31/2016*, at 3, https://humantraffickinghotline.org/sites/default/files/Motel%20and%20Motel%20 Topical.pdf (last visited Sept. 9, 2021).

[9] Jon Conte et al., *Businesses Ending Slavery and Trafficking, Inhospitable to Human Trafficking Program Evaluation* 5 (July 2014), [https://web.archive.org/web/20210511135432/https://www.bestalliance.org/uploa ds/5/0/0/4/50047795/itt_program_evaluation.11_without_appendix.pdf].

[10] Polaris Project, *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking* 16 (2018), https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems- and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Motels-and-Motels.pdf (last visited Sept. 9, 2024).

**Exhibit F 037**

"disclosed they never received any assistance, concern, or identification from motel staff."[11]

85.

Defendants knew or should have known that attorneys for the motel industry estimated and reported to motel industry representatives that eight out of ten human trafficking arrests occur in or around motels,[12] and that the industry had been warned, among other things, to "Make sure motel not complicit," "Manager not looking the other way," and "No pay off for silence or lack of curiosity."[13]

86.

Defendants knew or should have known that the organization called End Child Prostitution and Trafficking (ECPAT-USA) launched The Code of Conduct for the Protection of Children from Sexual Exploitation in Travel and Tourism (the "Code") in the United States in 2004.[14]

---

[11] *Id.* at 23.

[12] Rich Keating, *Human Trafficking: What Is it and How It Impacts the Hospitality Industry* 6 (presentation at AHIA Sprint Conference 2013), [https://web.archive.org/web/20191030203754/http://www.ahiattorneys.org/aws/A HIA/asset_manager/get_file/92983].

[13] *Id.* at 19.

[14] *See The Code*, ECPAT-USA, www.ecpatusa.org/code/ (last visited Jan. 21, 2025).

38

87.

Defendants knew or should have known that the Code, which lays out well-established best practices for the hospitality industry to identify, address, and deter sex trafficking, identifies six reasonable and logical steps motels and hotels can take:

(a)    establish corporate policy and procedures against sexual exploitation of children;

(b)    train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

(c)    include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

(d)    provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

(e)    support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and

(f)    report annually on the company's implementation of Code-related activities.

88.

Defendants knew or should have known that ECPAT is only one of several high-profile organizations that have for years given motels and hotels the tools to address the scourge of sex trafficking at motels.

Exhibit F 039

89.

Defendants knew or should have known that during the relevant period the Department of Homeland Security ("DHS") published guidelines to help motels and hotels detect and respond to human trafficking. DHS's guidelines instruct housekeeping, maintenance, front desk, and security, among other motel personnel, to be vigilant in looking for signs of human trafficking at motels and hotels, such as:

   (a)   persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, or unusual behavior;

   (b)   persons who lack freedom of movement or are constantly monitored;

   (c)   persons who have no control over or possession of money or ID;

   (d)   persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

   (e)   requests for room or housekeeping services (additional towels, new linens, etc.), but denial of motel staff entry into the room;

   (f)   the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

   (g)   extended stay with few or no personal possessions in the room;

   (h)   excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

   (i)   the same person reserves multiple rooms;

40

(j)    a room is rented hourly, less than a day, or for an atypical extended stay;

(k)    attempts to sell items to or beg from patrons or staff;

(l)    cars in the parking lot regularly parked backward, so the license plates are not visible; and

(m)    loitering and solicitation of male patrons.

90.

Defendants know full well the danger the motel poses to the surrounding community. Having successfully sold the motel at a large profit, the new developers of the property used the motel's well-known reputation for crime as a justification for the city to approve turning the motel into an apartment building.

91.

The developer's attorney stated in the news and at public meetings, "This is an area that has been challenged. We know this property has an issue with crime and security and do believe that the conversion would help this situation."[15]

92.

The same news report noted that the motel has "a reputation in the community for being the site of criminal activity."[16]

---

[15] Erica Murphy, *This Motel 6 in Marietta could soon be an apartment complex | Why people aren't excited about the idea* (July 7, 2023), https://www.11alive.com/article/news/local/marietta/marietta-proposal-to-turn-motel-6-into-apartments/85-0a694fc0-500a-4d0f-9ca5-fe71817d1272.
[16] *Id.*

41

93.

The developer's attorney also wrote that "the location of the Property and use has made the Property a frequent location for criminal activity."[17]

94.

Dan Flynn, the former Marietta police chief stated that the Motel 6 "was very problematic. We had a lot of calls involving prostitution, we had a lot of calls involving drugs. And even though they often hired a part-time police officer, that really did not slow it down."[18]

95.

Without a market—a conveniently located and anonymous place to confine humans, exchange money, and have sex—sex trafficking would cease to exist. In Plaintiffs' case, Motel 6, for a fee, provided this market for Plaintiffs to be confined and sold.

## COUNT I
## STATUTORY LIABILITY: SEX TRAFFICKING
## 18 U.S.C. § 1595

96.

Plaintiffs incorporate the paragraphs above as if fully restated herein.

---

[17] Hunter Riggall, *Developer proposes converting Marietta motel into apartments* (Apr. 17, 2023), https://www.newsbreak.com/news/2994535324811-developer-proposes-converting-marietta-motel-into-apartments.

[18] *Id.*

42

**Exhibit F 042**

97.

In violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a), Defendants knowingly benefitted from participation in a venture that Defendants knew or should have known engaged in acts in violation of the TVPRA.

98.

Defendants knowingly benefitted from Plaintiffs' sex trafficking by receiving revenue generated by the operation of the Motel 6, including the revenue generated for the rooms in which Plaintiffs were trafficked. Each day Plaintiffs' were trafficked at the Motel 6, Defendants knowingly benefitted by receiving money from Plaintiffs' trafficking in the form of room rental fees.

99.

Defendants participated in a motel venture and knew or should have known that their operation of the motel violated the TVPRA by harboring and maintaining Plaintiffs so that they could be sold for sex at the Motel 6.

100.

The venture in which Defendants participated was in or affecting interstate commerce.

43

101.

Defendants knew or should have known the venture engaged in acts in violation of the TVPRA because Defendants' agents, employees, and representatives, participated in Plaintiffs' sex trafficking at the Motel 6. Defendants should have known of this participation.

102.

Defendants knew or should have known the venture engaged in acts in violation of the TVPRA because Defendants' agents, employees, and representatives knew or should have known of other sex trafficking and sex crimes at the motel before and while Plaintiffs were trafficked for sex at the Motel 6.

103.

Defendants are directly and vicariously liable under 18 U.S.C. § 1595(a) for the actions of their agents and representatives.

104.

Plaintiffs have suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of Defendants' participation in this venture.

105.

Defendants are liable to Plaintiffs for their damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under 18 U.S.C.

44

§ 1595(a).

106.

All Defendants are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiffs, whose damages were proximately caused by the acts discussed in this count.

## **Count II – Nuisance**

107.

Plaintiffs incorporate the paragraphs above, as if fully set forth herein.

108.

O.C.G.A. § 41-1-1 provides that "A nuisance is anything that causes hurt, inconvenience, or damage to another and the fact the act done may otherwise be lawful shall not keep it from being a nuisance.  The inconvenience complained of shall not be fanciful, or such as would affect only one of fastidious taste, but it shall be such as would affect an ordinary, reasonable man."

109.

O.C.G.A. § 41-1-2 provides that "Nuisances are either public or private. A public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals. A private nuisance is one limited in its injurious effects to one or a few individuals."

45

110.

O.C.G.A. § 41-1-3 provides that "A public nuisance generally gives no right of action to any individual. However, if a public nuisance in which the public does not participate causes special damage to an individual, such special damage shall give a right of action."

111.

O.C.G.A. § 41-3-1 provides that "Whosoever shall knowingly erect, establish, maintain, use, own, or lease any building, structure, or place for the purposes of sexually related charges[19] shall be guilty of maintaining a nuisance; and the building, structure, or place, and the ground itself in or upon which such sexually related charges occurred or were conducted, permitted, carried on, continued, or shall exist, and the furniture, fixtures, and other contents of such building or structure shall be deemed to be a nuisance."

**Public Nuisance**

112.

The Motel 6's history of rampant crime and illegal sex activity created a spillover effect that led to other crime occurring in the surrounding area.

---

[19] O.C.G.A. § 41-3-1 defines "sexually related charges" to mean trafficking a person for sexual servitude, public indecency, prostitution, keeping a place of prostitution, pimping, pandering, or masturbation for hire.

**Exhibit F 046**

113.

The Motel 6 caused or contributed to a blighting effect on the surrounding community, so that the Motel 6 negatively damaged all persons who came within the sphere of operation of the crime, sex trafficking, and prostitution at the Motel 6, although the effects on each person may have varied.

114.

The illegal prostitution and sex trafficking nuisance occurring at the Motel 6 had an appreciable blighting effect on the surrounding community, permitting persons of questionable character, and encouraged idleness, loitering, vagrancy, and had a tendency to breed crime and debauch the morals of the community.

115.

Defendants controlled the nuisance because they controlled the motel. They could have *not* allowed the rampant prostitution and sex trafficking at the Motel 6, including Plaintiffs, but instead they chose to facilitate, conceal, and participate in that activity so that they could reap the ill-gotten profits of Plaintiffs, and others, suffering.

116.

The acts and omissions of Defendants in permitting prostitution and sex trafficking at the Motel 6 caused special damages to Plaintiffs, as they were victims of sex trafficking at Defendants' nuisance motel and suffered damages to their

47

health, including mental and emotional harm, pain and suffering, and Defendants are liable to Plaintiffs for all such damages.

### Nuisance per se pursuant to O.C.G.A. § 41-3-1

117.

The Motel 6 constituted a statutory nuisance per se under Georgia law because the motel knowingly and/or negligently turned a blind-eye and permitted illegal sexually related crimes to occur at the motel including rampant prostitution, pandering, pimping, and sex trafficking.

118.

Prior to and following the minor sex trafficking of Plaintiffs, Defendants failed to act on its knowledge of prior prostitution and sex trafficking, and failed to act to correct, prevent, or warn of the prostitution and sex trafficking occurring at the motel, and the dangerous environment created on the property. Defendants' failure to take appropriate action to remedy or reduce the danger to the public, including Plaintiffs, allowed the dangerous environment at the Motel 6 to continue to exist unabated, thereby creating a nuisance that continues to this day.

119.

Plaintiffs were directly harmed as a result of the Motel 6 being a nuisance motel that permitted illegal sexual activity to occur there.

48

Exhibit F 048

120.

O.C.G.A. § 41-3-1 does not by its terms create a private cause of action. However, the *fact* that the Motel 6 is deemed a statutory nuisance per se under Georgia law is relevant in defining and determining *whether* the Defendants motel was a nuisance. And under Georgia law, it was.

121.

Defendants are liable for their public nuisance by reason of their failure to remedy the dangerous condition of prostitution and sex trafficking that persisted over a period of time as a continuous and repetitious condition and of which Defendants had express notice and knowledge, and whereby Plaintiffs were direct victims of such activity.

**Count III**
**Statutory Liability: Masha's Law 18 U.S.C. § 2255**
**W.K. and J.T. against all Defendants**

122.

Plaintiffs W.K. and J.T. incorporate the paragraphs above, as if fully set forth herein.

123.

As described above, Defendants directly participated in the minor sex trafficking of J.T. and W.K. by knowingly assisting and facilitating their sex trafficking at the Motel 6 because their staff openly participated in J.T.'s trafficking,

49

*supra* paragraphs 33–47 and W.K.'s trafficking, *supra* paragraphs 48–57. Thus, Defendants committed the predicate offense of a violation of 18 U.S.C. § 1591 as to J.T. and W.K.

124.

J.T. and W.K. were under the age of 18 when they were trafficked at the Motel 6.

125.

J.T. and W.K. were the victims of violations of 18 U.S.C. § 1591 at the Motel 6.

126.

J.T. and W.K. suffered injuries as a result of Defendants' violations of 18 U.S.C. § 1591 and 18 U.S.C. § 2255.

127.

Defendants knew or recklessly disregarded that means of force, threats of force, fraud, coercion, or any combination of those means would be used to cause J.T. and W.K. to engage in commercial sex acts at the Motel 6.

128.

Defendants knowingly harbored, provided, obtained and maintained J.T. and W.K. at the Motel 6 by providing them and their traffickers rooms in the hotels, extra illegal services, such as acting as lookouts, in and affecting interstate commerce.

50

129.

Defendants knowingly benefitted financially or by receiving anything of value, from participation in the ventures of renting rooms to J.T.'s and W.K.'s sex traffickers who violated 18 U.S.C. § 1591 as to J.T. and W.K.

130.

Thus, as described herein, Defendants are jointly and severally liable to W.K. and J.T. for compensatory and punitive damages, in an amount to be determined at trial.

## **DAMAGES**

131.

Plaintiffs incorporate the paragraphs above as if fully restated herein.

132.

As a proximate and foreseeable result of Defendants' violations of the TVPRA, Masha's Law, and Georgia law, Plaintiffs sustained personal injuries, mental and emotional pain and suffering, experienced mental anguish, and suffered other damages as will be proven at trial. Plaintiffs bring each and every claim permissible under Georgia and federal law against Defendants for injuries suffered in the incident at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, pain and suffering, and all compensatory, special, actual, general and punitive damages permissible under Georgia and federal

51

**Exhibit F 051**

law. Plaintiffs seek all compensatory, special, economic, consequential, general, punitive, and all other damages permissible under Georgia and federal law, including, but not limited to:

a) Personal injuries;

b) Past, present and future conscious pain and suffering;

c) Loss of enjoyment of life;

d) Medical expenses;

e) Mental anguish and emotional distress;

f) All special, compensatory, economic, punitive, and other damages permissible under Georgia and federal law; and

g) Consequential damages to be proven at trial.

### 133.

Plaintiffs are entitled to an award of punitive damages without limitation or cap because the actions of Defendants and their employees were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

### 134.

Defendants' actions evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiffs undue expense. Thus, Plaintiffs are entitled to recover their necessary expenses of litigation, including an award of reasonable

52

attorneys' fees and expenses required by this action. (O.C.G.A. §§ 13-6-11, 9-11-68 and 9-15-14, and 18 U.S.C. § 1595(a)). Furthermore, Plaintiffs are entitled to all expenses of litigation and attorneys' fees pursuant to all other Georgia and federal statutory and common laws.

WHEREFORE, Plaintiffs pray for a judgment to be awarded to them and against Defendants for the following:

a) Process issued as provided by law;

b) Plaintiffs be awarded actual damages in amounts to be shown at trial from Defendants;

c) Plaintiffs be awarded all general, special, compensatory, economic, consequential, punitive and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendants;

d) Plaintiffs be awarded a trial by jury; and

e) Plaintiffs have such other relief as this Court deems just and appropriate under the circumstances.

TRIAL BY JURY IS HEREBY DEMANDED.

Respectfully submitted on May 9, 2025.

ANDERSEN, TATE & CARR, P.C.

*/s/ Jonathan S. Tonge*
PATRICK J. MCDONOUGH
Georgia Bar No. 489855

53

**Exhibit F 053**

pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com
JENNIFER M. WEBSTER
Georgia Bar No. 760381
jwebster@atclawfirm.com
*Attorneys for Plaintiffs*

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 236-9784| Facsimile

## CERTIFICATE OF COMPLIANCE

Under Local Rules 5.1(C) and 7.1(D), I hereby certify that the foregoing filing complies with the applicable font type and size requirements and is formatted in Times New Roman, 14-point font.

Respectfully submitted on May 9, 2025.

ANDERSEN, TATE & CARR, P.C.

*/s/ Jonathan S. Tonge*
PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com
JENNIFER M. WEBSTER
Georgia Bar No. 760381
jwebster@atclawfirm.com
*Attorneys for Plaintiffs*

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 236-9784| Facsimile

**Exhibit F 055**

"To become the highest occupancy economy motel in the Atlanta metro area within the first five years through our commitment to creativity and resourceful ingenuity."

# LEXICON HOSPITALITY, LLC

A group of investors from Bangladesh and China were interested in the hospitality industry in the United States and sought an experienced leader in the industry who was already familiar with the market. The investors determined Sadrul Amin possessed the knowledge, talent and skill needed for their venture. Together they formed Lexicon Hospitality, LLC in 2010. From its inception, the company's strategy was to become a leader in the economy hotel business in the

## OUR PARTNERS



## OUR VISION

"We continue to be committed to our foundational goals and values of creativity and resourceful ingenuity. Through best business practices and operations, we will solidify Lexicon Hospitality as a leader in the industry."

**— Sadrul Amin**
President
Lexicon Hospitality, LLC

## OUR GALLERY



**Exhibit F 057**

   

studio6-3        microtel-3        model6-2        model6-3

## CONTACT US

**Envato**
2360 DELK ROAD, MARIETTA
GA 30067

770.952.8161

info@lexiconhospitality.com (mailto:#)

## LINKS

Home (http://lexicon-hospitality.com/)
Lexicon Hospitality (http://lexicon-hospitality.com/lexicon-hospitality/)
Gallery (http://lexicon-hospitality.com/gallery/)
Contact (http://lexicon-hospitality.com/contact/)

## NEWSLETTER

**Subscribe**

Exhibit F 058

SOCIAL  MEDIA



© 2017 Lexicon Merchandise (http://www.lexiconbd.org).  All rights reserved.

**Exhibit F 059**

# LEXICON HOSPITALITY



A group of investors from Bangladesh and China were interested in the hospitality industry in the United States and sought an experienced leader in the industry who was already familiar with the market. The investors determined Sadrul Amin possessed the knowledge, talent and skill needed for their venture. Together they formed Lexicon Hospitality, LLC in 2010. From its inception, the company's strategy was to become a leader in the economy hotel business in the United States through applying "best practices" and excellence in leadership.

In 2011, Atlanta, Ga.'s real estate market values were favorable for buyers. Lexicon began with the vision to grow the reach of the company through acquisitions of existing properties. Soon after its incorporation, Lexicon purchased a Travelodge in



Atlanta, Ga., as well as a Motel 6 and a Studio 6 both located in the Atlanta suburban community of Marietta. Soon after the

**Exhibit F 060**

purchase, profi tability of the acquired properties improved. As sales revenues grew, Lexicon reinvested approximately $3 million to improve all three properties. Over the next 48 months each of the physical properties were transformed to support the company's values and commitment to excellence in hotel hospitality. In February 2015, Lexicon closed on the purchase of Microtel in Cartersville, Ga., one of the northern-most suburban communities of Atlanta.



Since its inception the stated mission of Lexicon has been: "to lead Lexicon to become the highest occupancy economy motel in the Atlanta metro area within the next fi ve years through our commitment to creativity and resourceful ingenuity."
Under the leadership of Amin, the properties have flourished and each of the key performance indicators for all of its properties has dramatically improved in less than fi ve years. Average occupancy, average daily rate and revenue per available room for each of the four locations have steadily grown under the management of Amin and his staff. The STAR Report, the world's foremost source of historical data and performance rating for the hotel industry, has already shown Lexicon properties as leaders in the economy hotel market in the metro Atlanta area.

On its surface, Lexicon's rapid rise to the top of the economy hotel market might appear to be an overnight success. With closer scrutiny, it is clear that Lexicon's success is the direct by-product of Amin's application of 20 years of knowledge,  expertise and skills previously mastered in the hospitality industry.

**Exhibit F 061**

## CONTACT US

**Envato**
2360 DELK ROAD, MARIETTA
GA 30067

770.952.8161

info@lexiconhospitality.com (mailto:#)

## LINKS

Home (http://lexicon-hospitality.com/)
Lexicon Hospitality (http://lexicon-hospitality.com/lexicon-hospitality/)
Gallery (http://lexicon-hospitality.com/gallery/)
Contact (http://lexicon-hospitality.com/contact/)

## NEWSLETTER

**Subscribe**

## SOCIAL MEDIA



© 2017 Lexicon Merchandise (http://www.lexiconbd.org). All rights reserved.

Exhibit F 063

# LEADERSHIP



**Education**
B.S. Marketing
Stockton State College
Pomona, NJ, USA

**Corporate Training:**
Hilton Program
Motel 6 Program
Served as Trainer for Motel 6 GMs

**Mohammed Sadrul Amin — President**

Amin's experience in the hospitality industry spans more than 25 years. His career began at the Hilton Casino in Atlantic City, N.J. He has managed properties in South Carolina, North Carolina, Tennessee, Alabama and Georgia, spending the majority of his career with Accor North America, the worldwide leader of hotel operators. Amin has

**Exhibit F 064**

managed up to 40 properties at one time. Through his wide range of experience and desire to improve the hotel guest experience, he has developed an astute business acumen for the industry.As a recognized leader, Amin was selected as a corporate mentor for the General Manager Leadership Team, whose focus was in the area of preventative maintenance efficiency. He worked in collaboration with PhD students from the Georgia Technical Institute to define and document algorithms that provided forecasts to formulate a successful PM program. In 1999, Mr.Amin developed a plan for Motel 6 that ultimately launched the Studio 6 chain as an extended-stay spin-off for Motel 6. He was the first operator of this pilot project which achieved six months of 100 percent occupancy. The success of his vision has resulted in the growth of the Studio 6 chain to more than 450 properties nationwide.Through Amin's mentoring, Lexicon has created a culture that identifies individual talent, drive and dedication to cultivate team members for future management opportunities. This ability to see potential in others and consistently produce competent, skilled leaders is a vital asset and a core value of the Lexicon Hospitality brand.

To successfully grow the fixed assets and human resources of Lexicon Hospitality, Amin employs many of his skills, including a keen sense of financial management, creation of capital growth strategies, revenue and profit growth development, strategic market planning and positioning, project management, human resource management, renovation and re-engineering, quality control and the management of multi-unit facilities.

**Exhibit F 065**



### Joy Golden — Business Manager

Joy Golden serves as the business manager and brings more than a decade of hospitality management experience to Lexicon Hospitality. Her experience ranges from managing economy/budget and midscale properties to private resorts. Golden plays a vital role in Lexicon, and she is skilled at a broad range of responsibilities that benefi t the effi ciency and profi tability of Lexicon. Through her leadership experience she has honed her skills in administration, operations, oversight of renovations, sales and marketing, and human resources.

## CONTACT US

**Envato**
2360 DELK ROAD, MARIETTA
GA 30067

770.952.8161

info@lexiconhospitality.com (mailto:#)

**Exhibit F 066**

## LINKS

Home (http://lexicon-hospitality.com/)

Lexicon Hospitality (http://lexicon-hospitality.com/lexicon-hospitality/)

Gallery (http://lexicon-hospitality.com/gallery/)

Contact (http://lexicon-hospitality.com/contact/)

## NEWSLETTER



**Subscribe**

## SOCIAL MEDIA

f   🐦   💲   G+

© 2017 Lexicon Merchandise (http://www.lexiconbd.org). All rights reserved.

# CHARTER INVESTORS



**Zhu Ge**

Mr. Ge is the managing partner and director of Dallian Latex Co., Ltd. in Ningbo, China, a company that distributes products worldwide, with marketing and administration offi ces in various countries. Manufacturing plants span across eastern and southern Asia, (with operations of approximately 200,000 square meters). Dallian produces latex products including transfusion tubes, surgical gloves, examination gloves, industrial gloves and a range of other products. Ge also serves as a director of Lexicon Hospitality, LLC.

## CONTACT US

**Envato**
2360 DELK ROAD, MARIETTA
GA 30067

770.952.8161

info@lexiconhospitality.com (mailto:#)

# LINKS

Home (http://lexicon-hospitality.com/)
Lexicon Hospitality (http://lexicon-hospitality.com/lexicon-hospitality/)
Gallery (http://lexicon-hospitality.com/gallery/)
Contact (http://lexicon-hospitality.com/contact/)

# NEWSLETTER

**Subscribe**

# SOCIAL MEDIA



© 2017 Lexicon Merchandise (http://www.lexiconbd.org). All rights reserved.

# POSITIONED FOR GROWTH



Through the strategic implementation of his plan for each facet of the business, Amin and his team have made remarkable strides toward their goal to build a signifi cant economy hotel business. Amin currently leads his team in the management of the four Lexicon properties. Revenues for Lexicon grew from $3.5 million to more than $6 million in just four years. Lexicon Hospitality is poised for growth and continues to evaluate growth opportunities through plans to diversify their holdings and soon expand to full-service luxury hotels. The Lexicon infrastructure offers a proven record and operation methodologies for more efficient management of properties and staff. Amin has created a strong team at Lexicon Hospitality, positioning
the organization for future growth.

The larger and most iconic hotels in Atlanta are seeing strong performance as a result of conventions and tourism. Key hotel metrics (occupancy, average daily rates and revenue per available room) are all trending upward. These inner-city properties serve as an indicator to the suburban markets. Mark Woodworth, Senior Managing Director of PKF Hospitality

**Exhibit F 070**

Research says, "As that continues to perform well, it suggests very positive things for the outlying submarkets around the city." This is good news for Lexicon as potential properties are considered as part of the company's next phase of growth.

The  evaluation process for future investments by Lexicon is rigorous. Independent studies by industry leaders, such as STR, publisher of The STAR Report, are first reviewed. Lexicon evaluates the past and current performance of the hotel. Amin and his team also do an independent review of the key performance indicators, conduct a thorough inspection of the property and evaluate the demographics and accessibility of the location before ordering a formal real estate appraisal. Environmental studies are conducted as well as attorney due diligence. Next, a plan is developed to determine what is needed for increasing the key performance indicators. Budgets are developed and projections are formulated. With each step in the process the Lexicon team weighs the potential return on investment to mitigate risks of the company's investment. Once these steps have been taken, investors are advised of the proposed acquisition for their review.

## CONTACT US

**Envato**
2360 DELK ROAD, MARIETTA
GA 30067

Exhibit F 071

770.952.8161

info@lexiconhospitality.com (mailto:#)

## LINKS

Home (http://lexicon-hospitality.com/)
Lexicon Hospitality (http://lexicon-hospitality.com/lexicon-
hospitality/)
Gallery (http://lexicon-hospitality.com/gallery/)
Contact (http://lexicon-hospitality.com/contact/)

## NEWSLETTER

**Subscribe**

## SOCIAL MEDIA



© 2017 Lexicon Merchandise (http://www.lexiconbd.org). All rights
reserved.

# PERFORMANCE HISTORY

The corporate strength of Lexicon Hospitality, LLC and its management is demonstrated through the performance of each of the properties and the STAR Report rankings.

Lexicon Hospitality, LLC has consistently improved year after year, as evidenced by every key performance indicator to reach the five year goal outlined in 2011.

**\* Debt Ratio:** In 2015 Lexicon's leaders elected to borrow $1.1 million of the purchase price for the Microtel property. Revenues generated from this property are being used to reduce the long-term debt.

GROWTH OF NET SALES & TOTAL OPERATING ASSETS



NET PROFIT | TANGIBLE NET WORTH



OPERATING INCOME | NET SALES



MANAGEMENT RATE RETURN





CONTACT US

**Envato**
2360 DELK ROAD, MARIETTA
GA 30067

770.952.8161

info@lexiconhospitality.com (mailto:#)

LINKS

Home (http://lexicon-hospitality.com/)
Lexicon Hospitality (http://lexicon-hospitality.com/lexicon-hospitality/)
Gallery (http://lexicon-hospitality.com/gallery/)
Contact (http://lexicon-hospitality.com/contact/)

NEWSLETTER

**Subscribe**

SOCIAL MEDIA

© 2017 Lexicon Merchandise (http://www.lexiconbd.org). All rights reserved.

Exhibit F 076

# CAPITALIZING ON OUR BRANDS

Each of the Lexicon Hospitality properties has the advantage of strong name recognition and brand awareness. Lexicon has used this to its advantage through franchise marketing, billboards, interstate signage and advertising.



As a result of one of the most successful ad campaigns in the history of the hotel industry, Motel 6 enjoys strong national brand awareness and high levels of guest loyalty. According to Market Matrix and Nationwide Surveys, current guest ratings rank Motel 6 fi rst in as the price-value and fi rst in "very likely to return" ratings.

Studio 6 leverages the same strong name recognition as Motel 6 with an identity all its own. As an extended-stay property, studio units are fully furnished and feature amenities for comfortable extended stays at low weekly rates.

Exhibit F 077

*Travelodge* is an internationally recognized brand with hotels across the United States, Canada, the United Kingdom, Spain, Ireland, New Zealand
and Australia. Travelodge is best known for its mascot "Sleepy Bear," a halfawake teddy bear. As part of the Wyndham brand, Travelodge has enjoyed strong name recognition since 1940.

Microtel is also an internationally known brand providing accommodations for guests in Argentina, Canada, Mexico, the Philippines and throughout the United States. It too is under the Wyndham brand and is considered to be in the mid-scale segment, resulting in higher pricing of the rooms.








Motel 6
2360 Delk Road
Marietta, GA 30067

Located in Metro Atlanta; one of the premier locations at the Delk Road exit and visible from highly traveled Interstate 75 with an average daily traffi c count of 238,500+ vehicles. Near the new Major League Baseball stadium for the Atlanta Braves opening in 2017 Suburban, North Metro Atlanta, Cobb County (2015 – population 730,981) 214 rooms, 5-stories, 35 employees, Built 1969, renovation completed 2014
Located near shopping and dining, visit Six Flags White Water Park or Cumberland and Galleria malls; seasonal outdoor pool, free WiFi in all rooms.

Amenities: kids stay free, coffeemakers with free coffee, shared outdoor pool, guest laundry, color television with free expanded cable, alarm clock/radio, data port, hair dryer, iron and ironing

**Exhibit F 078**

board; pets welcome for additional fee, phone with voice mail and free local calls; work desk with lamp, A full-service banquet facility known as the "Harvest Hall" is on-site.

**Occupancy History under Lexicon's Management**





Studio 6
2360 Delk Road
Marietta, GA 30067

Located in Metro Atlanta and near the new Atlanta Braves stadium, which will open in 2017 Suburban, North Metro Atlanta, Cobb County (2015 – population 730,981)

113 studio units, 5-stories, 10 employees

Built 1969, renovation projected to be 100 percent complete April 2016

Amenities: full kitchenettes in all rooms, 2 burner stove, three-quarter-size size refrigerator and freezer, granite counter top, sink, cookware, utensils, microwave, coffee makers with free coffee, color television with cable alarm clock/radio, data port, hair dryer, iron and ironing board, Pets welcome for additional fee, phone with voice mail and free local calls, work desk with lamp.

**Occupancy History under Lexicon's Management**



**Exhibit F 079**














Atlanta Airport South
2471 Old National Pkwy
College Park, GA 30349

Located within two miles of the Hartsfi led-Jackson Atlanta International Airport; less than 15 miles from downtown Atlanta Urban; Fulton County; Atlanta is both the county seat and state capital city (2015 population 996,319) 103 rooms, 2 stories, 20 employees Built 1983; renovation completed 2014

Amenities: free continental breakfast, high-speed internet access in meeting rooms, and public areas with wireless data connection, Wi-Fi internet access in each room, children stay free

**Occupancy History under Lexicon's Management**

**Exhibit F 080**





**BY WYNDHAM**

1348 Joe Frank Harris
Pkwy SE
Cartersville, GA 30120

Located in Cartersville, Ga., this property is near the new, recently completed LakePoint Sporting Community; near the Booth Western Art Museum, an affi liate of the Smithsonian Institution; also a new theme park is currently in development with plans to open in 2019 Northwest edge of the Atlanta metropolitan area; Cartersville is the county seat for Bartow County (2010 census – population 100,157 ) 71 rooms, 4 stories, 15 employees, built 2008

Amenities: complimentary breakfast, on-site meeting rooms, laundromat, safe deposit box, children stay free, high-speed internet access in business center, meeting rooms, and public areas, wireless data connection in meeting rooms and public areas, wired data connection in meeting rooms

### Occupancy History under Lexicon's Management



2014  BEFORE LEXICON HOSPITALITY MANAGEMENT

2015  FEBRUARY 28, 2015 LEXICON HOSPITALITY MANAGEMENT BEGAN

**Exhibit F 081**



## CONTACT US

**Envato**
2360 DELK ROAD, MARIETTA
GA 30067

770.952.8161

info@lexiconhospitality.com (mailto:#)

## LINKS

Home (http://lexicon-hospitality.com/)
Lexicon Hospitality (http://lexicon-hospitality.com/lexicon-hospitality/)
Gallery (http://lexicon-hospitality.com/gallery/)
Contact (http://lexicon-hospitality.com/contact/)

## NEWSLETTER

Exhibit F 082

**Subscribe**

## SOCIAL MEDIA



© 2017 Lexicon Merchandise (http://www.lexiconbd.org). All rights reserved.

Exhibit F 083

# GALLERY









Exhibit F 084



























## CONTACT US

**Envato**
2360 DELK ROAD, MARIETTA
GA 30067

770.952.8161

info@lexiconhospitality.com (mailto:#)

## LINKS

Home (http://lexicon-hospitality.com/)
Lexicon Hospitality (http://lexicon-hospitality.com/lexicon-hospitality/)
Gallery (http://lexicon-hospitality.com/gallery/)

**Exhibit F 087**

Contact (http://lexicon-hospitality.com/contact/)

NEWSLETTER

**Subscribe**

SOCIAL MEDIA



© 2017 Lexicon Merchandise (http://www.lexiconbd.org). All rights reserved.

# CONTACT

**Full Name**

**Email**

**Phone**

**Subject**

**Message**

Submit

**Lexicon Hospitality, LLC**

2360 DELK ROAD, MARIETTA
GA 30067
Phone: 770.952.8161

**Exhibit F 089**

Email: info@lexiconhospitality.com
(mailto:info@lexiconhospitality.com)
Web: www.lexiconhospitality.com

CONTACT US

**Envato**
2360 DELK ROAD, MARIETTA
GA 30067

770.952.8161

info@lexiconhospitality.com (mailto:#)

LINKS

Home (http://lexicon-hospitality.com/)
Lexicon Hospitality (http://lexicon-hospitality.com/lexicon-hospitality/)
Gallery (http://lexicon-hospitality.com/gallery/)
Contact (http://lexicon-hospitality.com/contact/)

NEWSLETTER

**Subscribe**

SOCIAL MEDIA

© 2017 Lexicon Merchandise (http://www.lexiconbd.org). All rights
reserved.

## DECLARATION OF N.W.

███████████, pursuant to 28 U.S.C. § 1746, and subject to the penalties of

perjury declares as follows:

1. My name is ██████████. I am more than twenty-one years of age,

   competent to testify, and have no legal or mental disability and have personal

   knowledge of the facts stated herein. I freely give this declaration for use in

   this case. This declaration was executed in the state of Alabama where I am a

   resident.

2. I was a resident of Motel 6 on Delk Road for a period of about 6 months in the

   year 2012. I was 20 years old at the time and was held there by a trafficker and

   made to have sex for money. I was not there by my free will. Each day I was

   made to sell sex to more than ten (10) men.

3. It is my recollection that most every young female who was staying at Motel 6

   during the time I was there were also with men selling sex. I often spoke to two

   of them near the front door or elsewhere on the property. There was a lot of

   men coming and going hourly. Pimps would sit outside in cars and watch the

   rooms or walk around the property.

4. On October 29, 2012 a man walked into my room and demanded sex from me

   and I did not know who he was so I told him to leave. Her called the police and

said he was being robbed. The police came and spoke to me and others in my room but the man left before the police arrived. Crystal Greenwood, who worked there, was on duty that night and spoke to the police. After that event, we were not asked to leave the property but rather moved to a different room.

5.  At the time I stayed at Motel 6 on Delk road, there was no security. The managers and employees surely knew what was going on there as they were able to see everything that I and others saw each day.

6.  I have read this Declaration consisting of 9 numbered paragraphs and I declare under penalty of perjury that it is true and correct.

Executed on May 24, 2024.



# **DECLARATION OF** <span style="background:black">████████</span>

████████ pursuant to 28 U.S.C. § 1746, and subject to the penalties

of perjury declares as follows:

1. My name is <span style="background:black">████████</span>.  I am more than twenty-one years of age,

   competent to testify, and have no legal or mental disability and have personal

   knowledge of the facts stated herein.  I freely give this declaration for use in

   this case.  This declaration was executed in the state of  eorgia where I am a

   resident.

2. I was trafficked as a minor and also as an adult for several years. I was

   trafficked at Motel 6 on Delk Road off and on throughout that time. My

   trafficker always rented the room.  I would stay at the Motel 6 for two to three

   days each time I was taken there by my trafficker. I had to turn 7 or 8 tricks a

   day.

3. I was told by my trafficker to "get cool" with the housekeepers and hotel staff. I

   gave the housekeepers tips at the Motel 6. The room would always have many

   used condoms in the trash. There was a maintenance worker who regularly

   appeared at my door and told me my trafficker sent him to the room to get what

   he wanted, which was always sex. My trafficker was very close to one of the

   housekeepers whose name I believe was Maria.

4. I remember being friends with two other girls when I was at Motel 6. They were also being sold for sex. ███ was 16 years old and ███ was 15 years old. They did not work for my trafficker and were not with us but were in separate rooms.

5. Every time I was at Motel 6 on Delk Road, I always saw lots of girls, young and old, dressed like prostitutes walking the property, in the breezeways, and walking up to cars. There were always traffickers in the parking lot waiting while girls had dates in their rooms.

6. It was very clear to anyone who looked around that the hotel was filled with illegal sex workers and minors being sold for sex.

7. I have read this Declaration consisting of 7 numbered paragraphs and I declare under penalty of perjury that it is true and correct.

Executed on April 25, 2025.

